Filed 3/11/25  P. v. Trowbridge CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>ADAM TROWBRIDGE,<br><br>　　　　Defendant and Appellant. | A169050 & A169872<br><br>(Solano County Super. Ct. No. FCR-367504) |

Within the span of two weeks, Adam Trowbridge committed multiple incidents of domestic violence against his wife and then, in violation of a protective order, brought a loaded gun with him to the house where his wife and children lived. After he was refused entry, Trowbridge fired the gun into the air and then turned the gun on himself.  Trowbridge ultimately pled no contest to one felony count of unlawful firearm activity (Pen. Code, § 29825, subd. (a))[1] and one misdemeanor count of domestic violence (§ 273.5, subd. (a)).  He appeals from the trial court's order suspending the imposition of sentence and granting probation, arguing that the trial court abused its discretion in previously finding him unsuitable for pretrial mental health diversion pursuant to section 1001.36.  We disagree and affirm.

---

[1] Undesignated statutory references are to the Penal Code.

1

## BACKGROUND

### A.

On January 12, 2023, after consuming cocaine and beer, Trowbridge argued with his wife, accused her of cheating on him, pushed her, and slapped her multiple times. She suffered bruising on her upper lip, a scratch on her forehead, and redness on her nose where her glasses had been pushed into her face.

Eleven days later, Trowbridge renewed his cheating accusations, looked through their phone bill, and questioned his wife about numbers he did not know. Trowbridge's wife confirmed that one of the numbers belonged to a male friend that Trowbridge did not know. Trowbridge repeatedly slapped her in the face—using "a lot of force" such that she fell to the floor several times, was in "a lot of pain," and her glasses were broken. Trowbridge eventually walked away, and his wife called 911. Her face was red, swollen, and caused her pain for about 30 minutes.

When police arrived, Trowbridge's wife obtained an emergency protective order after she reported what happened that day and on January 12. Trowbridge was arrested and served with the emergency protective order, but he called his wife twice from jail.

Two days later, Trowbridge's wife was home with two of the couple's three children, as well as her mother. Trowbridge knocked on the door and Trowbridge's mother-in-law answered. She told him to leave and closed the door. Trowbridge's wife then watched surveillance video (live from her Ring camera) as Trowbridge asked to come in, knocked on the windows and door, and pulled at the locked screen door.

Next, Trowbridge looked into the Ring camera and said, "don't make me do this," as he pulled out and cocked his gun. Trowbridge pointed the gun at the sky and fired. Trowbridge's

2

wife was on the phone (with a 911 dispatcher) in her bedroom, with her mother and children. They screamed when they heard the gunshot. Trowbridge knelt in front of the Ring camera, said "please don't make me do this," and pointed the gun at his head. His wife watched him pull the trigger, but the gun did not discharge.

**B.**

Trowbridge was charged with discharge of a firearm with gross negligence (§ 246.3), unlawful firearm activity based on a protective order violation (§ 29825, subd. (a)), three counts of misdemeanor disobeying a court order (§ 166, subd. (a)(4)), and two counts of misdemeanor domestic violence (§ 273.5, subd. (a)).

Trowbridge filed an application for pretrial mental health diversion, pursuant to section 1001.36. In support of his motion, Trowbridge submitted a psychological evaluation report prepared by his retained expert, Brittany A. Cunningham, Ph.D. Dr. Cunningham's evaluation states that, after interviewing Trowbridge, reviewing his medical records, and performing psychological and neuropsychological testing, she diagnosed Trowbridge with post-traumatic stress disorder (PTSD)— stemming from adult and childhood trauma (including witnessing domestic violence between his own parents)—along with several substance use disorders.

Trowbridge reported longstanding trauma-related mood instability, which worsened after the death of his father two years earlier. He often tried to self-medicate with alcohol or illegal substances.[2] Dr. Cunningham observed that he "was

---

[2] Trowbridge reported that he began drinking alcohol at age 14, drank "a 12 to 24 pack of beer daily," and that drinking had " 'always [been] a constant' " up until his arrest. He used cannabis approximately three to four times per week (throughout his adult life) and began using cocaine daily after his father's death. He acknowledged that "substance use has been his

experiencing marked trauma-related mood instability in the weeks leading up to his arrest[] . . . secondary to notable interpersonal and legal stressors. Additionally, he had discontinued his psychiatric medications approximately two weeks before his arrest, which contributed to psychiatric and behavioral decompensation."

As to whether diversion would pose an unreasonable risk of danger to public safety, Dr. Cunningham provided a vague, qualified answer: "This is a legal question I leave to the court. However, assessment findings indicate Mr. Trowbridge did not represent an imminent risk of danger to himself or others at the time of the evaluation. Further, available records suggest [his] history is not indicative of a significant pattern of violence or pervasive criminal lifestyle with the exception of persistent substance use. . . . Risk assessment for [intimate partner violence] incorporates several factors specific to the domestic partnership that is outside [the] scope of this evaluation, as it relies on extensive data collection and interviews with both partners. Long-term inpatient substance recovery treatment that provides a highly structured setting will help mitigate the potential for violence/relapse by allowing him to develop more effective ways to self-regulate and manage trauma-related symptoms."

The People opposed Trowbridge's diversion application, arguing that he failed to meet his burden to show all the eligibility and suitability requirements (§ 1001.36, subds. (b)-(c)) were met, and that, in any event, the trial court should use its discretion to deny the application. The People acknowledged Trowbridge had no prior criminal record but asserted that the matter was not just an isolated suicide attempt caused by a

primary method of coping with symptoms of mental illness" and that he had never maintained any sustained period of sobriety while in the community.

4

mental health crisis (as the defense asserted).  Instead, they stated the charges stemmed from a series of domestic violence events that culminated in Trowbridge going to his wife's house, in violation of a protective order, and discharging a firearm there in his family's presence.

The trial court denied Trowbridge's motion, finding him to be an unreasonable danger to public safety and that, "[e]ven without that finding," mental health diversion was not appropriate.  The court stated that it was exercising its discretion to reach that conclusion by considering the primary purposes of the mental health diversion law.  It further explained that, while it was to Trowbridge's "credit that he [was] trying to seek [mental health] treatment," he could receive similar treatment in probation.

## C.

Trowbridge then entered a no contest plea to felony unlawful firearm activity and one count of misdemeanor domestic violence.  Pursuant to a plea agreement, the trial court granted the People's motion to dismiss the remaining charges, suspended the imposition of sentence, and placed Trowbridge on probation for three years with various conditions—including that he serve 364 days in county jail (with credit for 456 days served) and that, upon release, he commit himself to a substance abuse and mental health residential treatment program.

Trowbridge filed a timely notice of appeal but his request for a certificate of probable cause was denied.  After this court issued an order for a peremptory writ of mandate (*Trowbridge v. Superior Court* (Feb. 2, 2024, A169523) [nonpub. opn.]),[3] the trial

---

[3] We deny as unnecessary Trowbridge's request for judicial notice of the exhibits and petition he filed.  (See *In re Reno* (2012) 55 Cal.4th 428, 484 ["[p]etitioners need not separately or

court granted Trowbridge's request for a certificate of probable cause.

## DISCUSSION

### A.

Trowbridge maintains the trial court abused its discretion by finding him unsuitable for mental health diversion. We disagree.

### 1.

In 2018, the Legislature enacted sections 1001.35 and 1001.36, thereby creating "a pretrial diversion program" for certain defendants with mental health disorders. (*People v. Frahs* (2020) 9 Cal.5th 618, 624.) Section 1001.36 gives the trial court discretion, if the defendant meets six eligibility and suitability requirements, to grant either temporary or permanent postponement of prosecution to allow the defendant to undergo mental health treatment. (§ 1001.36, subds. (a)-(c), (f)(1); *Frahs,* at pp. 626-627.) "Diversion can be 'viewed as a specialized form of probation, . . . [that] is intended to offer a second chance to offenders who are minimally involved in crime and maximally motivated to reform.' " (*People v. Qualkinbush* (2022) 79 Cal.App.5th 879, 886 (*Qualkinbush*).)

"As presently enacted, section 1001.36, subdivision (b) provides that a defendant is eligible for pretrial diversion if two criteria are met. First, the defendant has been diagnosed with a mental disorder . . . within the last five years by a qualified mental health expert. (§ 1001.36, subd. (b)(1).) Second, the 'defendant's mental disorder was a significant factor in the commission of the charged offense.' (§ 1001.36, subd. (b)(2).) 'If the defendant has been diagnosed with a mental disorder, the

specifically request judicial notice of all documents connected with their past appeals"].)

6

court shall find that the defendant's mental disorder was a significant factor in the commission of the offense unless there is clear and convincing evidence that it was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense.' (*Ibid.*)" (*People v. Graham* (2024) 102 Cal.App.5th 787, 795.)

"If a defendant meets these eligibility requirements, the court also must find that the defendant is suitable for pretrial diversion based on satisfaction of the following criteria: '(1) In the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder causing, contributing to, or motivating the criminal behavior would respond to mental health treatment. [¶] (2) The defendant consents to diversion and waives the defendant's right to a speedy trial . . . . [¶] (3) The defendant agrees to comply with treatment as a condition of diversion . . . . [¶] [and] (4) The defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community.' (§ 1001.36, subds. (c)(1)–(4).)" (*People v. Graham, supra*, 102 Cal.App.5th at p. 795.)

Section 1170.18, in turn, defines " 'unreasonable risk of danger to public safety' " as "an unreasonable risk that the petitioner will commit a new violent felony within the meaning of" section 667, subdivision (e)(2)(C)(iv). (§ 1170.18, subd. (c); *People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1149 (*Whitmill*).) Thus, a trial court must determine whether "the defendant is likely to commit an offense . . . known colloquially as a ' "super strike." ' " (*People v. Bunas* (2022) 79 Cal.App.5th 840, 851, fn. 11 (*Bunas*).) Qualifying super strikes include homicide, attempted homicide, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, any serious or violent felony punishable by death or life imprisonment, and any sexually violent offenses or sexual

offense committed against minors under the age of 14. (§ 667, subd. (e)(2)(C)(iv); *Whitmill*, at pp. 1150-1151.)

Mental health diversion is discretionary, not mandatory, even if all the requirements are met. (§ 1001.36, subd. (a); *People v. Gerson* (2022) 80 Cal.App.5th 1067, 1080; *People v. Oneal* (2021) 64 Cal.App.5th 581, 588.) But this " 'residual' " discretion must be exercised consistently with the principles and purpose of the law, which includes a strong legislative preference for treatment of mental health disorders because of the benefits of such treatment to both the offending individual and the community. (*Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 892-893; accord, § 1001.35; *Qualkinbush, supra*, 79 Cal.App.5th at p. 891.)[4]

We review the trial court's ruling on mental health diversion for abuse of discretion. (See *Whitmill, supra,* 86 Cal.App.5th at p. 1147; *Bunas, supra,* 79 Cal.App.5th at p. 848.) " 'A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence.' " (*Whitmill,* at p. 1147.)

**2.**

We reject Trowbridge's assertion that the trial court applied the wrong standard—by purportedly relying on his general risk of violence rather than his specific risk of committing

---

[4] The purposes of the legislation are to increase diversion of people with mental disorders to mitigate their entry and reentry into the criminal justice system "while protecting public safety," to allow local discretion in developing and implementing diversion across a continuum of care settings, and to meet the needs of those with mental health disorders. (§ 1001.35.)

a super strike offense—in finding that his diversion would present an unreasonable risk to public safety.

True, trial courts cannot use their discretion to deny diversion using a different definition of risk to public safety than that set forth in the statute. (*Sarmiento v. Superior Court, supra,* 98 Cal.App.5th at pp. 895-896; accord, *Whitmill, supra,* 86 Cal.App.5th at pp. 1150-1151, 1155-1156; but see *Qualkinbush, supra,* 79 Cal.App.5th at p. 891.) And risk that a defendant is likely to " 'commit[] crimes like kidnapping, robbery, assault, spousal abuse, torture of small animals, carjacking or felonies committed on behalf of a criminal street gang' " is not determinative. (*People v. Hoffman* (2015) 241 Cal.App.4th 1304, 1310-1311.)

However, Trowbridge does not meet his burden of demonstrating that the trial court used the wrong standard here. (See *People v. Pacheco* (2022) 75 Cal.App.5th 207, 213 (*Pacheco*) [appellant bears burden to demonstrate abuse of discretion]; *People v. Jacobo* (1991) 230 Cal.App.3d 1416, 1430 [reviewing courts presume that trial court knew and applied correct law, unless appellant affirmatively demonstrates otherwise].) He does not cite any portion of the record that affirmatively demonstrates the court decided that the public safety requirement was unmet merely because Trowbridge was generally dangerous or that the court analyzed the risk to public safety under any standard other than that described above.

In fact, both Trowbridge's counsel and the People explicitly cited the correct standard in arguing their opposing positions. Specifically, the People argued that Trowbridge's charged offenses—which involved multiple and escalating instances of violence against his wife and his taking a firearm to her house (in clear violation of a court order) and firing it—demonstrate that he poses an unreasonable risk to public safety because, if treated in the community, he was at unreasonable risk to commit a super

9

strike (homicide). In announcing its public safety finding, the trial court specifically acknowledged the primary authority relied on by Trowbridge (*Whitmill, supra*, 86 Cal.App.5th 1138)—which applied the correct standard for making a danger to public safety finding (*id*. at pp. 1150-1151)—distinguished *Whitmill* factually, and explicitly stated that it was exercising its residual discretion by considering the primary purposes of the mental health diversion law (not traditional sentencing considerations).

In short, we have no basis for concluding that the trial court applied an incorrect legal standard.

**3.**

Nor do we agree with Trowbridge that substantial evidence does not support the trial court's implicit finding that mental health diversion presents an unreasonable risk that he will commit a super strike.

In assessing that risk, the trial court may consider the opinions of the district attorney, the defense, and *qualified mental health experts*, *as well as the defendant's treatment plan, the defendant's violence* and criminal history, *the circumstances of the charged offense,* and any other factors the court deems appropriate. (§ 1001.36, subd. (c)(4); *Bunas, supra*, 79 Cal.App.5th at pp. 861-862.)

Here, Trowbridge has not been previously convicted of a super strike, nor was he charged with one in the instant case. However, that is not determinative. (See *People v. Hall* (2016) 247 Cal.App.4th 1255, 1266 [rejecting argument that trial court may only exercise its discretion to find an unreasonable risk to public safety when considering an offender who has previously committed a super strike].) In fact, Trowbridge has *no* prior criminal history. Nonetheless, our description of the circumstances of the charged offenses shows that they are

10

particularly concerning (not only because of the danger Trowbridge presents to himself).

Trowbridge angrily attacked and injured his spouse on two different occasions. Although he did not manage to inflict serious injuries, his violence escalated (over a relatively brief period) and appears to have been motivated—at least in part—by jealousy and a desire to dominate and control his wife. We can infer that the trial court was implicitly concerned that " ' "there [is] a great likelihood that any one battering episode is part of a larger scheme of dominance and control [and] that scheme usually escalates in frequency and severity." ' " (*People v. Kerley* (2018) 23 Cal.App.5th 513, 535; accord, *United States v. Castleman* (2014) 572 U.S. 157, 160 ["[d]omestic violence often escalates in severity over time"].)

Indeed, the trial court had ample grounds for such concerns. After he was arrested and served with a protective order following the second charged instance of domestic violence, Trowbridge violated the order almost immediately. Most seriously, he went to his wife's house in violation of the protective order, with a loaded gun, and tried (somewhat forcefully) to enter, even after he had been told to leave. Trowbridge ambiguously threatened (via the Ring camera) to shoot somebody—" 'don't make me do this' "—then fired a warning shot, and finally tried to shoot himself. Although he fired the warning short into the air, by doing so he endangered the lives of people in the residential neighborhood. And by attempting to shoot himself while his family watched, he tried to escalate the conflict to a violent end and traumatized his wife and two children.

It is not unreasonable for the trial court to have considered the level of violence and trauma that he was willing to inflict or alternative scenarios if, for example, he had gained entry to the house. (Cf. *Pacheco, supra,* 75 Cal.App.5th at pp. 209-210, 213-

11

214 [trial court did not abuse discretion in considering possible casualties to residents or firefighters that could be caused if defendant were again to intentionally start a brush fire]; *People v. Brown* (2011) 192 Cal.App.4th 1222, 1237 ["murder is 'the ultimate form of domestic violence' "].)

The trial court could also properly consider that Trowbridge had received mental health treatment *before* the charged offenses. (See *People v. Hall, supra,* 247 Cal.App.4th at p. 1262 [" '[t]he critical inquiry . . . is not whether the risk is quantifiable, but rather, whether the risk would be "unreasonable" ' "].) Two weeks before the charged offenses, Trowbridge had unilaterally discontinued his prescribed psychotropic medication.

Trowbridge argues that his is not the type of case where we should uphold the trial court's dangerousness finding. (Cf. *People v. Moine* (2021) 62 Cal.App.5th 440, 451 (*Moine*) [recognizing reviewing courts "have affirmed denials of resentencing under section 1170.18's 'dangerousness' prong where the petitioners had long criminal histories involving violent felonies"].) He relies on *Whitmill, supra*, 86 Cal.App.5th 1138, *Moine, supra*, 62 Cal.App.5th 440, and *People v. Williams* (2021) 63 Cal.App.5th 990).

We have no dispute with any of these cases, wherein reviewing courts concluded the trial courts abused their discretion, in the mental health diversion context, by finding those defendants posed an unreasonable risk of danger to public safety. (*Whitmill, supra*, 86 Cal.App.5th at pp. 1143-1144, 1146, 1150-1151 [no substantial evidence to support finding defendant—charged with discharge of a firearm with gross negligence—posed unreasonable risk of danger when he fired gun only into the air in a parking lot, did not injure anyone, threw the gun away and tried to avoid confrontation, cooperated with police, and criminal history involved only drug offenses and theft]; *Moine, supra,* 62 Cal.App.5th at pp. 444-445 & fn. 2, 450-

451 [abuse of discretion to find defendant in case involving charges of assault (fist fight) and criminal threats (against other victims) posed unreasonable risk of danger because no evidence he had access to guns, two psychiatrists opined he posed a low risk of committing future assaults, his criminal history included no violent felonies, and trial court previously released defendant on bond]; *People v. Williams, supra,* 63 Cal.App.5th at pp. 993-994, 1002-1003 [abuse of discretion to find defendant in felony stalking case posed unreasonable risk of danger because underlying charges involved disturbing threats but were not super strikes, mental health experts opined he posed a low risk to public safety, there was no evidence he had access to weapons, and trial court previously released defendant on bond].) Trial courts must consider carefully the facts of each case and the purpose of the statute when exercising the discretion that the Legislature granted them.

All three cases are readily distinguishable because, here, Trowbridge's charged offenses involve actual, repeated, and escalating violence (not mere threats) targeted at his wife, his personal possession and firing of a firearm outside his wife's home after he was thwarted from entering, his willingness to shoot himself and traumatize his family, and no clear opinion from a mental health expert that Trowbridge poses a low public safety risk. In fact, Dr. Cunningham's report explicitly leaves resolution of this issue to the trial court, states only that he posed no *imminent* danger to himself or others, and wholly fails to assess the risk Trowbridge would pose to his estranged wife or another romantic partner. Trowbridge's refusal to abide by the terms of the protective order also supports the trial court's finding that treating Trowbridge in the community would present an unreasonable risk that he would commit a super strike. (See *People v. Jefferson* (2016) 1 Cal.App.5th 235, 245.) "[T]here is nothing in section 1001.36 . . . that precludes a trial court from relying *primarily, or even entirely*, on the circumstances of the

13

charged offense or offenses in denying a motion for diversion." (*Bunas, supra*, 79 Cal.App.5th at p. 862, italics added.)

The trial court ultimately granted Trowbridge formal probation *after* the parties reached a plea agreement and several of the charged offenses were dismissed by the People. Contrary to Trowbridge's belated assertion in his reply brief, we see no irreconcilable conflict. It is not unreasonable for the trial court to decide formal probation, with its inherent threat of prison, provides greater motivation and supervision than mental health diversion. (See *Pacheco, supra,* 75 Cal.App.5th at p. 214.) We agree with *Whitmill, supra*, 86 Cal.App.5th at p. 1155, that this reasoning, if applied in *every* case, would "moot the statute." That is precisely why the Legislature entrusted courts with discretion to weigh the competing interests.

At the trial court level, reasonable minds might differ as to whether Trowbridge is likely to commit a super strike. On appeal, however, we cannot determine the trial court abused its discretion simply because evidence in the record could support either conclusion. (See *People v. Brown* (2024) 101 Cal.App.5th 113, 124.) Trowbridge has not shown that the trial court's finding is unsupported by substantial evidence. (See *People v. Jefferson, supra,* 1 Cal.App.5th at pp. 238-239, 245 [finding that defendant convicted of commercial burglary for theft of ink cartridge was likely to commit a super strike was supported by his prior convictions for assault, and battery, and a robbery involving personal use of a firearm and infliction of great bodily injury, in combination with multiple rule violations in prison and multiple parole violations].) No abuse of discretion has been shown.

## DISPOSITION

The order denying mental health diversion is affirmed.

14

                                                          BURNS, J.

WE CONCUR:


SIMONS, ACTING P.J.
CHOU, J.

*People v. Trowbridge (A169050, A169872)*

15